I'll hear from Mr. Larry Watts when you're ready. May it please the Court, Judge Dennis, Judge King, Judge Clement. The Court's rules say to argue not the facts and not the briefs, we've read those and this has been well briefed. So I'm going to focus on the three points that I think are really of interest. Number one, this case was decided pre-Lane v. Frank, so Lane v. Frank is important. Number two, in the District Court's opinion, I think that he substantially deviated from the standard of review. Number three, I think that he delved into sorting out the stuff of motives and he shouldn't have. Now with regard to Lane v. Frank, that case has been addressed by this Court at least four times that I'm aware of in recent months. In that case, we're taught three things that I think are important. Number one, we're taught that simply because speech is based upon information gained in the workplace doesn't mean that it's unprotected. Number two, we're taught that speech, when compelled in an official proceeding in Lane v. Frank, is not done at a trial, that it is a matter of general public concern because it deals with the truth in an official proceeding. And the third thing we're taught is that Garcetti meant whether speech of issue is itself ordinarily within the scope of an employee's duties is the key and not merely whether it concerns those duties to be determined whether Garcetti applies. In this particular case, the District Court's opinion starts off on page seven and he notes that even if speech is not necessarily required by an employee's job duties, it is not protected if it is sufficiently related to them. He then says later on that same page whether the speech resulted from special knowledge gained as an employee. He then says on page nine that regarding an issue on which she had special knowledge, and then he says on page 10, speaking as a part of her public job, and then he goes to page 13 and he notes that they were speaking as HISD employees to HISD retained investigators in connection with an official HISD investigation. All of their speech was therefore made pursuant to their official duties. That's the compelled speech matter. Now, we're talking about these three lawyers. These are three investigators. They happen to be lawyers, but they're not hired . . . But that's who we're talking about, all right, that's what you're talking about. Well, I'm talking about in the pleadings I set out that the contract they have is not as lawyers. They're specific. While the trial court made a note that they were, quote, retained in their law firm, they were not retained as lawyers. Specifically, they were excluded from practicing law and giving legal opinions. Specifically, they were hired to replace the investigation unit of the Houston Independent School District. And the reason for that is very simple. HISD's counsel, mostly their outside counsel, didn't want competition. And so that's what we have here. Three lawyers, actually two lawyers, Diana Paris-Gomez and Elizabeth Mata-Kroger, they were lawyers and they were not acting as lawyers. Frizzell and Majlott were investigators. Frizzell is an ex-CIA agent and Majlott is his companion. So what we have is people being called in, in an official investigation, being interviewed, and they had no right to say no. You're terminated if you don't. I mean, Garrity tells us that even police officers have to go in and talk, but they can have a warning or they can sign a particular statement that protects them. So we're talking principally about having to go in and respond, and they did. But what becomes the issue here is the compelled response. I think that it's very telling when you look at what is pled. And by the way, this is non-evidentiary and I understand that. This is simply deciding whether we get to do any discovery. But when you look at the pleading, you'll see that I set out in that pleading a statement that was made to Herbert Linton, who was terminated with Mabel Kaleb. And the statement was made by Diana Paris-Gomez, the investigator who is also a lawyer, and Frizzell, and I believe in Majlott. And they told him, you're not the focus of this. You're not the target. You're not an issue. You don't get the big picture. And that was repeatedly the statement, you don't get the big picture. Well, that big picture is in and of itself the motive behind all of this. And what was that big picture? The big picture was to get Mabel Kaleb and make all of these outrageous, vile assertions about this woman who spent 33 years of her life in HISD, who was a leader in the community, who happened to, by the way, when she went to the church on November the 12th, the trial judge didn't quite understand how she got there. He first said she was invited by State Representative Harold Dutton. He says that twice. He then says, well, she went there because Greer told her to go there. She went there to speak for Greer. That's not true. In the pleading, she wasn't going to go. She was shopping with her granddaughter. She knows Harold Dutton. She had been invited by Harold Dutton to go to the church that night. And the church wasn't to talk about her replacement. The pleading sets out very clearly. The church was to have a meeting to discuss outrage against Dr. Greer for having lied to the pastor about not terminating Burnett Harris as the interim principal of Key Elementary. In fact, at that very meeting that night, Dr. Greer had three of his high-ranking administrators. He had a deputy general counsel who tape recorded. He had the area superintendent of schools, Cynthia Wilson, who took photos of Mabel Caleb with Harold Dutton in the parking lot as Dutton made a sign that would be used the following day to picket Greer. And he sent also, or had there, the former area superintendent, Thelma Garza. She didn't go there that night because Greer asked her to go there. She didn't go there that night as a school representative. She went there that night and, as a courtesy to Greer, said he's sorry he couldn't be here. But then everything else, from the moment she started talking to the crowd to the time that she left with Harold Dutton and went into the parking lot until she was focused in the camera of Thelma Garza and Cynthia Wilson while looking at a sign that was being put together to picket Greer the following day, she was engaged in matters of general public concern. Now I think it's very interesting, and I think it may be, I would call it a smoking gun. Look at the pleadings, and goodness knows I tried to whittle them down, believe it or not. But look at, but there are five, there were five plaintiffs and there were four defendants. But look at the pleadings and you'll see that on the following day, November the 13th, after the 12th church meeting, Greer is picketed by Dutton and Pastor Jones at the school administration building. The pleadings state that Greer telephones both men on his cell phone and their cell phones and tells them, please stop, stop the picketing. And they say, we won't do it unless you attend a town hall meeting tomorrow on Saturday. And he said, I'll do it, just stop. And they did. Now, what's the first thing that the pleadings say that Greer did? He called Mabel Caleb and told her to get herself up to his office. And then when she gets up there, the next thing the pleadings say that he did was he said I'm going to go to a meeting on the 14th, another town hall meeting, I'm going to show up. But he made then the classic comment that we've heard several times, dating back to Earl Butz, how do you speak to these people? How do you talk to these people? Well she was being linked by Greer with these people who were the people that had picketed him, who were the people she had spoken with and had been seen with and photographed with the night before. Now, in terms of how the judge did not follow the standard of review, this is a, evidence is not an issue. Quamley even doesn't speak in terms of evidence, talks in terms of fact. The judge talks in terms of evidence. But what we have is the judge saying there's no evidence, and then the pleadings are replete with facts. He says there's no plausible chronology. In order for him to say there's no evidence or no facts, he has to take all of the bulk of facts that have been laid out by me in the pleading and he has to weigh them out and say those are not to be considered. In order for him to say there's not a plausible chronology, he has to take the chronology which I think is a powerful chronology. I put together almost a day by day timeline from public records and he has to say that's not plausible. And when he does that, he's weighing what happened. He draws inferences, inductive inferences. He draws inferences when he doesn't have the right to. And every inference he draws is against my clients. Every comment he makes is against my clients. And that's just not the way a 12b-6 is supposed to operate. If we had gotten past 12b-6, he would have had the opportunity to weigh out the evidence and he could go in there and do that. But even then under strictures, the last thing, the motive, why, and I know you've read the brief so I'm not going to belabor the points, but why in the name of heaven would all of this happen to Mabel Caleb, Herbert Linton, Jackie Anderson who's not here, Patrick Cockerham, Diane Banks, why would it happen? Because if you look at that timeline, it all started with November the 12th. Everything started. The anonymous phone calls. Let me tell you my opinion, Your Honors, and I'm going to give you this back. But this, there used to be in some of the law offices, they described floor-planned litigation. Well, this is a floor-planned event preparing for a litigation just to try to get rid of Mabel Caleb. And when her people, her clique as they're called, wouldn't lie, it suddenly became about them. Remember the pleadings say Jackie Anderson and all of them were told, this is not about you. Get the big picture. And when they didn't lie, it became about them. Herbert Linton said, I get the big picture. All right, you made a due process claim saying that these people had not had administrative hearings, but that all had hearings before they were terminated or retained. No, they didn't all have hearings. Who didn't have a hearing? Mabel Caleb didn't have a hearing. What about Banks, Cockerham, and Linton all had hearings? Herbert Linton had a hearing that he was supposed to have, or supposed to have had a hearing. But what happened is they lied, read the pleadings, they lied to him and said that his accuser witness, Glenn White, wasn't there when in fact they were hiding Glenn White out in the room adjacent to the hearing room. And the only reason that Herbert Linton and his lawyer knew that Glenn White was there was because when they were leaving the school administration building, Glenn White goes by in his pickup truck and says, indicating, call me. But he had a hearing. Well, I think the test is meaningful hearing. I don't think that that was quite a meaningful hearing. Well, it's your allegation. It certainly wasn't. It certainly wasn't what I think. I'm in red now. All right, thank you. Thank you, sir. I'll try to address that, Judge Clement. Sure. We'll see what opposing counsel says. Mr. Morris? Arturo, Michelle, for HISD and Mr. Greer, I thought that was the orders that I would go. Okay. For HISD and then Mr. Morris. May it please the Court, if I may, John Hopkins with my firm is at the end of the table and Kevin Risley on the center end is here for the Appalachia Investigators, Frizzell and Majlott. With regard to HISD and Dr. Greer, there are three of the plaintiffs below, only three appellants that are at issue here before this court. That's Diane Banks, Patrick Cockerham and Herbert Lenton. Those are the claims that I will address. Mr. Watts spoke about the freedom of expression claim, the free speech claim. This is a traditional analysis which includes Garcetti as clarified now by Lane. But even with the clarifications in the recent cases and even if this preceded the Lane decision, the decision below properly applies the law even under the current state. What you have with regard to these three are employees who were questioned by an employer because the employer believed that there was wrongdoing by these employees and also questions with regard to others. When you look at the Lane analysis which talks about what is ordinarily within the duties of an employee, this squarely fits in it. Lane and cases that the progeny of Lane stand for the proposition that there is no one determinative factor. Job descriptions are often vague and do not align with job duties. Something may relate to an employment duty, but the context or the circumstances under which the speech occurred may be different. But when you look at this situation where you have an employer who goes to an employee asking about wrongdoing, that is an inherent job duty of every employee because every employer will require of each employee that they respond to questions with regard to wrongdoing and demand that they respond truthfully to those questions. That's what occurred here. When you look at what happened in terms of the discussions and there is considerable time spent in the third amended complaint detailing the back and forth between the questioning and the employee's response, you see that it goes up the chain of command. It goes through the entire investigative process, then into a grievance process and evaluation process. There's a reference with regard to each of these three for a conference for the record that, as pled, states the conference for the record is the penultimate step to beginning an adverse employment decision, or at least the way the plaintiff has characterized it with regard to the loss of their employment. You will also see with each of these three that what they spoke about, as pled in the complaint, deals with circumstances that were within their knowledge as employees. Ms. Banks was a teacher who was accused of cheating on one of the standardized tests by means of introducing an actual live test information and distributing it so that the students would perform better than their own knowledge. Was that allegation proven? That allegation was not proven if you're referring to the disciplinary proceedings. No, the disciplinary proceedings with regard to Mr. Cochran and Ms. Banks, the hearing officer did not uphold the allegations of the school district. But in both of those instances, the employees, and as with Mr. Lenton, brought forth the knowledge they had about Ms. Banks, how she operated with regard to testing material, how she felt she was duped by others. Mr. Cochran and Mr. Lenton were both in the operations end. The allegations in the pleading address at length why they believe that they were operating under proper procedures, that they contacted central office administrators, that they followed certain procedures, or in some instances, like Mr. Cochran has pled that he said he was unaware and had not received training in certain procedures, such as the ProCard, the means to be able to make certain purchases. All of these reflect these peculiar circumstances of their own job duties. When you take all of this together under Lane, under current Fifth Circuit law, this is the quintessential case where someone is speaking, or as they're alleging, not speaking or refusing to say what they claim their employer wants them to say with regard to their employment duties. I think with these three, the pleadings are pretty clear in that regard. These three also bring a freedom of association claim. This claim really falls outside the two recognized areas of intimate relationships and an association for an expressive activity. There simply is nothing in the complaint with regard to any association other than they were associated with the principal, the appellant Mabel Caleb, as trusted employees or someone who worked closely with them in particular areas that the employer was looking at. There really are no other allegations with regard to that and there's no precedent in this circuit or, frankly, any other that would allow a free association claim based simply on the fact that they have an employment relationship with another employee. Can I ask a question about . . .  . . . that Mr. Watts brought up? He said that these three lawyers here were not hired as lawyers but were hired simply to be investigators. Of course, I have to say a lot of lawyers wind up doing a lot of investigation but it's usually the predicate for something else. What's your take on that? The difficulty that I see, one of the difficulties here, is that state agencies and public agencies routinely hire outside law firms and the state law authorizes that. I have a problem seeing how these lawyers become state actors here. I understand probably one of your other counsels is going to address that but HISD has a stake in the answer to that question. Right. HISD takes the position that these are not employees. There are large school districts, obviously, but many school districts do not have the resources to be able to investigate to keep on an ongoing basis on payroll personnel and often turn to outside lawyers, most often lawyers, sometimes investigators, to be able to investigate claims but they do not consider them to be employees or state actors. They gather information or if they're acting in a legal capacity, provide advice. What does the record reflect what these people were doing? I don't believe that the record is really the pleadings. I don't believe that the pleadings reflect the capacity in which they were operating with regard to whether they were hired as investigators or whether they were hired as attorneys under an attorney-client privilege. I will have to go back and I'll supplement for the court but I don't recall and my belief is that the record does not include that. The final item that I wanted to address was the liberty interest claim with regard to these three individuals. Here, the court below focused on the element of whether they were given the process that they were due, whether they received the hearing and all three received a hearing. Mr. Lenton did not prevail in his hearing and was terminated. Ms. Banks did prevail and as pled and in fact, she resigned and took a position with another school district and Mr. Cochran prevailed in his hearing and received employment at HISD. So under the liberty interest analysis, they received the process as they were due and there is nothing in the pleadings to indicate otherwise. Thank you. Thank you, sir. Next, Mr. Morris. May it please the court. Your Honor, this case from my perspective and certainly as it relates to my client, Ms. Elizabeth Mott Kroger is a very simple case and so I'm going to try to cut through what I think are some readily resolved arguments to get to some issues that the court has had questions about like the state action issue. First, though, I'd like to address the issue of whether there was a liberty interest claim and to directly answer Judge Clement's question and yes, the complaint filed by the plaintiffs reveals that Mr. Lenton did participate in what was described as HISD's flimsy policies, a grievance process, but he had the opportunity to speak nonetheless and we know based on the jurisprudence of this court and the Supreme Court, all that needs to be afforded to the employee is the right to state their case, not to summon witnesses. So while you heard some response from opposing counsel complaining about whether a witness was available or not for that grievance hearing, it's really immaterial under the standard as to whether each of these individuals had been afforded a name-clearing hearing. They all did, potentially with the exception of Ms. Caleb, but that claim, which is not advanced against my clients, or the clients of Mr. Ridley here, Mr. Majlott and Frizzell, that claim is solely advanced against HISD and that's not here before you. That's still pending in the district court. The second issue on the issue of freedom of association, I think that's the one that's most readily resolved because the associations that are implicated in the plaintiff's complaint solely relate to professional relationships as colleagues, the case that Ms. Caleb complains that she had along with Mr. Linton, Ms. Banks and Mr. Cockersham. Well, those types of professional relationships just do not have constitutional protection. They're not the type of intimate professional relationships that the Supreme Court and this court have recognized are deserving of constitutional protection. So with those thoughts in mind, and unless the court has any questions, I'd like to turn to the free speech claims. I know you've heard some of this, but I simply want to drive home the point that I think was ably established by my opposing counsel when he referenced Garrity. Employees, in the context of their employment, have an obligation, whether it's spelled out in their job description or not, to participate with an internal investigation of wrongdoing, which is what we had here. Cockersham, Linton, Banks were all the subjects of an internal investigation as to whether they had engaged in wrongdoing. Their refusal to participate in that investigation, law tells us, would have been tantamount to insubordination and would have required their discharge. So by necessity, when they're participating in a process where the master of that master-servant relationship is trying to determine whether there's been some wrongdoing, like theft, they are inherently speaking in their role as employees. And I think Lane makes the distinction appropriately, as does this Court's authority in Williams v. Dallas, is that first you need to look in the role in which they speak. And even in Garcetti says that if a public employee speaks pursuant to employment responsibilities, there is no relevant analog to speech by citizens who are not government employees. And that's what you had here, at least with respect to Linton, Banks, Cockersham. They were speaking in their role as employees, and there was no relevant analog. The simple criticism of them is that they wouldn't play ball and testify in a way that might have been hurtful to Mabel Caleb. That doesn't make a First Amendment retaliation claim. What was the outcome of the theft allegation of the furniture and the property that was moved from one school to the other? Your Honor, my recollection... Was it just being moved or was it being stolen? My recollection is that I don't know that there's one clear answer overall, because there were numerous hearings that were held with respect to certain employees, but as plaintiffs allege in their complaint, with respect to Anderson, I believe, and Cockersham and Banks, they were exonerated of these charges. And clearly there's nothing factually alleged in this complaint that would survive the stigma-plus test that they were incapable of fighting other employment. One is still an employee of the district. Banks resigned and soon found employment after. And again, that's not anything that I'm bringing to you as a lawyer who knows some of the background facts. I'm taking those, again, straight out of the complaint, as we must. I'm not deviating from the complaint when I tell you that. Now, critically important for me is that you understand that while Ms. Caleb's First Amendment retaliation allegations are not before you as they relate to HISD and Dr. Greer, they are before you as they relate to my clients as well as Mr. Majlott and Mr. Frizzell, because all claims were dismissed against the investigative team. But critically important, when you review this 111-page complaint, what is notable in its absence is any allegation that Ms. Kroger acted, or Mr. Majlott or Mr. Frizzell, for that matter, acted in response to any knowledge they held or in response to any speech that Mabel Caleb engaged in. In fact, you will see many motivations ascribed to Ms. Kroger in the complaint, some that she was just trying to please Dr. Greer, some that they wanted the money and prestige that came from the investigation, but none of the allegations support that she had taken any action in the conduct of the investigation or that Majlott or Frizzell had taken any action in the investigation in retaliation for any prior speech that Ms. Caleb had engaged in. Now, the district court found that certain of those allegations brought by Ms. Caleb wouldn't even stand reasonable inference or the plausibility test under Iqbal because of the lack of temporal proximity. But I'm here to say we don't even get that far with respect to the investigative team. There's simply no allegation that they took any action in response to any prior speech exercised by Ms. Caleb. And I'm running out of time, but I really want to address this state action issue because if I have one problem with the district's court opinion, it's with the state action issue. I think that the court, solely based on the allegation that the HISD Office of Professional Standards, an office which many districts don't have, sometimes conducts employment investigations, that from that you can extrapolate as a matter of theory and law that somehow these lawyers, outside independent investigators who were hired for their independence from a government entity and not acting under color of law, that somehow they were taking on an exclusively traditional public function of the government. Your Honor, we know by the jurisprudence of this court and the Supreme Court that test is reserved for very narrow circumstances, like operations of prisons, that have historically always been within the realm of the government's operations. But when governmental entities of all stripes, and particularly municipalities that don't have the resources to have inside investigative teams use lawyers, they do so with the understanding that they are not speaking as agents of the entity, but they are independent, and for that reason they cannot be state actors. I see that I am out of time. I simply request that the panel affirm the district court's decision with respect to our clients. Thank you, sir. Thank you. First of all, in answer to your question, Judge, were they lawyers or were they not? What did the pleading say? I had hoped that the trial judge would read the pleadings, and I had hoped that counsel would read the pleadings. When you asked that question, you didn't get a good answer. In the pleadings, it stated how the contract between Elizabeth Mata Kroger, Jackson Wisdom, and her firm specified what they could do or what they couldn't do. In the pleadings, it stated what the report that Elizabeth Mata Kroger constructed stated on the face of it. If you look at the brief at page 11, footnote 6, I cite the record on appeal, and I quote her report. It says, This report is prepared by M.D.J.W. for fact-finding purposes and is not intended to be legal advice. And then in bold thought, confidential, not for public disclosure, original 407, Houston Independent School District confidential investigative report, hereinafter confidential report. And at the bottom of each page, it's copyrighted. Secondly, the question comes up, well, what about Ms. Banks? She just resigned and went somewhere else. Do you know that even today, when you go on the Internet, you can find this report of Elizabeth Mata Kroger? Even today, it's still out there, floating out there, saying the vile things that it said in 2010 today. Diane Banks? Sure. After she won, and by the way, when counsel, Mr. Michel, prosecuted her for the district, he got in there, and much to his credit, he said, the real issue is whether or not she cooperated or didn't cooperate with regards to Adebayo. That's laid out in the pleadings. That's laid out in the pleas. And when Banks won, she did resign. She resigned and went to another district because she didn't trust him anymore. When she got to the other district, she was laid off. That district is represented by the same outside firm that represented HID, HISD, I don't know. But the only place that she could go because she was being stigmatized, her virtual certificate was being labeled under investigation, the only place she could go work was the place that had put the stigma on her. HISD. Indentured servitude, I think it is. But that's the only place she could go. Patrick Cockerham, he didn't work for a year. In terms of... In terms of the... Speech. I want to talk to you just for a minute about speech. The judge is right. He says there are five things of speech, five elements of speech, that Caleb outlines. Number one, that the 2005 speech. But he says that's too remote. But excuse me, Caleb didn't interject that into the play. She didn't interject that into the game. Marta Kroger on her own brought that up in her report. The 2007 speech, when Mabel Caleb goes to the public and she's answering questions about whether or not there is indeed toxic mold poisoning her faculty and her kids, and the school district says, monkey see, monkey do, that's not believable. And then CDC comes in and says, wait a minute, you've got toxic mold, and HISD has mud all over their face. And she became the figure that the paper said, yes, my kids are getting sick, my faculty is getting sick. And what about that? How did that get into the case? Mabel Caleb's 2007 episode on the mold, interjected by Marta Kroger. Mabel Caleb didn't bring it up. It would only be remote if Mabel Caleb said, I did this back then and this is the effect now. Then you'd have to look and say, well, what is a temporal proximity? Isn't that remoteness? But that's not what happened. What happened is Mabel Caleb's 2005 and 2007 activities were brought together, put together by Marta Kroger. Mabel Caleb never asserted that. And then the third element of speech, November 12th, the judge sort of passes that off. He says, well, she was invited to talk about who was going to replace her. I've already covered that. Parking lots, picket signs, and Terry Greer was called a liar. A liar, publicly. But more importantly, in the pleadings Mabel, Marta Kroger tells you that Mabel Caleb was not there to support the HISD. Now you say, well, okay, but how do we know about the furniture? You know what? All HISD ever did about the furniture was they say, well, we had a policy. All the furniture went to Kashmir. That was her furniture, by the way. The computers went to Kashmir. That's okay. And there were PC2 forms filled out. It was done appropriately. And the district, all it did was create a reason to conduct a post-November 12th reason to conduct an investigation to get my client. You know about this compelled speech business. Let me tell you. Here's the way I see that. I live on a farm. You can make a horse come to the water trough, but you can't make him drink. And that's exactly it. They have an obligation. They have an obligation as employees to get involved and participate. Every single client participated in the investigation conducted by Mata Kroger. You say, well, but counsel said she didn't have any evidence. The record is silent about what she did or why she was doing it. That's not true. Mr. Watts, I'm sorry. Thank you. Please look at that brief. It won't be adjourned until 1 p.m. Wednesday.